# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **NO. C13-5969BJR** |
| | ) | |
| **v.** | ) | |
| | ) | **ORDER GRANTING JUDGMENT** |
| **6 FIREARMS, ACCESSORIES AND** | ) | **TO PLAINTIFF** |
| **AMMUNITION** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## I.     INTRODUCTION

Plaintiff, the United States of America (hereinafter "the Government") commenced this civil action in rem to forfeit six firearms, accessories, and ammunition (hereinafter "the firearms") purchased by Claimant Beverly Taylor.[1] The Government alleges that the firearms are subject to forfeiture under the Federal Gun Control Act of 1968 because Ms. Taylor purchased the firearms as part of a "straw purchase," and in doing so, violated sections 922(a)(6) and 924(a)(1)(A) of the Act. Ms. Taylor denies the Government's charges and counters that she is the lawful owner of the firearms.

A bench trial was held before this Court on May 19, 2015. Matthew Thomas appeared on behalf of the Government; Beverly Taylor appeared *pro se*. The Court heard testimony from: Heidi Wallace, Special Agent Bureau of Alcohol Tobacco and Firearms; Jason Viada, Detective Sergeant; James Rogers, owner of Doc Neeley's Gun Shop; Joseph Lujan, employee of Doc

---

[1]      The six firearms are: (1) Colt M4 Rifle, s/n: LE130329; (2) Hi Point Model 4595 Rifle, s/n: R26814; (3) Ruger Model SR40C Pistol, s/n: 343-46304; (4) Beretta Model Nano Pistol, s/n: NUO35840; (5) Hi Point Model C9 Pistol, s/n: P1736847; and (6) Zastava AK-47 Rifle, s/n: N-PAP005021.

Neeley's Gun Shop; Don Carey, owner of Blue Mountain Gunworks; and Ms. Taylor. In

addition, the Court has reviewed and considered all exhibits admitted into evidence.

## II.      BACKGROUND

Ms. Taylor is a septuagenarian who lives with her adult son, Richard Rankich, in Port

Angeles, Washington. Rankich is a convicted felon, and as such, is prohibited from purchasing

or possessing firearms. TR 20-21. Ms. Taylor is aware of Rankich's felony convictions and of

the fact that he is prohibited from purchasing or possessing a gun. TR 36, 137. Rankich also

suffers from significant health issues. TR 125. Ms. Taylor testified that Rankich is diabetic and

his kidneys are failing. *Id*. He also has gastro paresis, high blood pressure, and retinopathy. *Id*.

Ms. Taylor fears that Rankich will not live much longer. At all times relevant to this lawsuit, Ms.

Taylor suffered from carpal tunnel syndrome in her left hand that caused her hand to swell and

shake. TR 43, 67.

The parties stipulate that Ms. Taylor purchased five of the firearms between September

22, 2012 and April 13, 2013. She made the purchases at Walmart, Doc Neeley's Cowboy Guns

and Gear, and Blue Mountain Gunworks, all located in Port Angeles, Washington. Dkt. No. 15 at

3. She purchased the sixth firearm in February, 2013 from Gold Mountain Arms in Poulsbo,

Washington. *Id*. There is no dispute that for each of the purchases, Ms. Taylor submitted

paperwork on which she affirmed that she is the "actual buyer" of the guns.

## III.      TRIAL EVIDENCE

### A.      Witness Testimony

Jim Rogers, the owner of Doc Neeley's Gun Shop, testified on behalf of the Government.

Rogers stated that his first contact with Ms. Taylor was on February 2, 2013 when she and

Rankich came to his store to purchase a Ruger SR40C. TR 73; P. Ex. 12. Rogers testified that at

the time of the purchase, Ms. Taylor "seemed very, very shaky," so much so that he assumed either she was ill, "or else she was really, really nervous." TR 78. According to Rogers, Rankich appeared to be directing the gun purchase by pointing out the Ruger SR40C as the gun that Ms. Taylor should buy. TR 75. Rogers testified that he was "a little bit surprised [that Ms. Taylor was buying that gun] because the SR40C is a compact, really powerful handgun for a lady." TR 75. He elaborated that he felt the Ruger SR40C would be "a real recoil monster for her. [He] didn't see her being able to handle the gun real well." TR 78.

Rogers testified that the circumstances of the purchase (*i.e.*, Ms. Taylor's shaky appearance, Rankich appearing to direct the purchase, and the type of gun purchased) led him to question whether Ms. Taylor was really purchasing the gun for Rankich. TR 75, 78. He claims he asked her whether she was buying the gun for Rankich, but she replied that the gun was for her. TR 75-76. To that end, Ms. Taylor filled out the required ATF Form 4473, indicating at Question 11.a. that she was the actual buyer of the gun. TR 77; P. Ex. 10. Nevertheless, Rogers was concerned enough about the gun purchase that he reached out to the Port Angeles Chief of Police as well as to a friend who is an agent with the United States Border Patrol to discuss his concerns. TR 80.

The next time Rogers saw Ms. Taylor and Rankich was on April 3, 2013. He testified that they came into his shop together and purchased a Beretta 9-millimeter handgun. TR 75; P. Ex. 13. Rogers testified that "Mr. Rankich told [Ms. Taylor] that that's the gun that she wanted to buy." TR 75. Once again, Ms. Taylor filled out the required Form 4473 and indicated that she was the actual buyer of the gun at Question 11.a. P. Ex. 10.

Rogers testified that Rankich then came into the store by himself on April 9th and purchased ammunition for a 9-millimeter handgun. TR 74; P. Ex. 15. Also around April 9th,

Rogers received a telephone call from Rankich in which Rankich asked Rogers if he would be willing to accept the transfer of an AK-47 from an out-of-state gun dealer.[2] Rogers testified that by this time, he had been informed that Rankich is a convicted felon and is not able to lawfully purchase a gun. TR 76. As such, Rogers declined to accept the transfer of the AK-47. *Id.*

Rogers then testified that Ms. Taylor and Rankich came into his gun shop together later on the evening of April 9th to purchase ammunition for an AK-47. TR 79.  Rogers claims that at that time, Rankich stated that he "personally owned a Hi-Point carbine and an AR." *Id.* Rogers further testified that while in the gun shop that evening, Rankich noticed a Hi-Point pistol and asked Ms. Taylor to purchase it. *Id.* Rogers stated that Rankich later changed his mind and they left the shop without purchasing the gun. *Id.* However, according to Rogers, they returned the next day and ordered the pistol. TR 80; P. Ex. 14. Rogers testified that once again he was concerned that the "purchase was not for [Ms. Taylor]," but rather, for Rankich. *Id.*

Next, Don Carey, the owner of Blue Mountain Gunworks, testified. Carey testified that in April 2013, he was contacted by a gun wholesaler who notified him that a Zastava semi-automatic AK was being transferred to his shop for pick up by Ms. Taylor and Rankich. TR 90, He testified that when Ms. Taylor and Rankich arrived the next morning to pick up the gun, Rankich made Carey feel "uncomfortable" because Rankich was wearing a hooded sweatshirt pulled over his head and his hands were in his pockets. TR 91. He also testified that Rankich was acting "erratic," "nervous, and very talkative" *Id.* He said Rankich was "just jabbering, kind of talking about gun-related stuff, but it really wasn't pertinent to the situation. And he kept interjecting, so much so that [Carey] had to ask [Rankich] to stop talking." TR 92.  Carey stated

---

[2]      If a gun is purchased from an out-of-state licensed gun dealer, federal law requires that the gun be transferred to an in-state licensed dealer before the gun can be transferred to the purchaser.

that the situation made him feel uneasy and while he admitted that he "didn't really have a clear signal that this was a straw purchase," he was uncomfortable enough that he asked Ms. Taylor to sign an affidavit (in addition to the required ATF Form 4473) to verify that she was purchasing the gun for herself. TR 94. Carey said that once Ms. Taylor signed both the Form 4473 and the additional affidavit, he felt "comfortable enough to go ahead" with the transaction. TR 95.

Detective Sergeant Jason Viada testified next for the Government. Viada is a sergeant with the Port Angeles Police Department and is responsible for supervising the Olympic Peninsula Narcotics Enforcement Team ("OPNET"). TR 98. At some point in April, OPNET was contacted by a US Border Patrol agent about Ms. Taylor's gun purchases. *Id*. OPNET learned that Ms. Taylor was scheduled to pick up a Hi-Point pistol from Doc Neeley's Gun Shop on April 15, 2013. TR 99. Viada went to the vicinity of the gun shop and waited for Ms. Taylor to arrive. *Id*. He testified that he observed Ms. Taylor and Rankich enter and later exit the gun shop. TR 102. He further testified that Rankich was carrying a box. *Id*. He then observed them enter Ms. Taylor's car where she and Rankich appeared to "handl[e] the gun back and forth between the two of them." TR 103. Viada testified that he and his OPNET team followed Ms. Taylor's car until she eventually arrived at home, at which point they detained Ms. Taylor and arrested Rankich. TR 104. They then searched Ms. Taylor's car and home. TR 105. In the car, Viada found a target stand, a map to a local shooting area known as "Slab Camp," a tag for servicing a firearm, and several receipts for gun related paraphernalia. *Id*. In the house, the OPNET team located the six firearms subject of this lawsuit and various shooting-related items and ammunition on and around the dining room table. TR 107. They also located a white box that Viada is "nearly certain" is the same box Rankich carried out of Doc Neeley's Gun Shop. *Id*.

In addition, they found a shipping receipt for a Crimson Trace laser sight, specifically for a Beretta Nano 9-millimeter sidearm. TR 108. The receipt was made out to Rankich. *Id.*

Heidi Wallace, a Special Agent for the Alcohol, Tobacco, and Firearm Agency, also testified on behalf of the Government. She testified that she was in Doc Neeley's Gun Shop on April 15, 2013 and observed Ms. Taylor purchase the Hi-Point pistol. TR 26. Wallace testified that she observed Ms. Taylor and Rankich enter the gun shop together and speak with Roger. TR 27. She further observed both of them speak with the gun shop employees while Ms. Taylor filled out the paperwork for the gun purchase. *Id.* She testified that, from her observation, Ms. Taylor did not appear to have difficulty hearing the gun shop employees.[3] *Id.* Wallace testified that after Ms. Taylor finished filling out the paperwork, she observed Rankich pick up the white box containing the Hi-Point pistol and walk out the door with Ms. Taylor. TR 28.

Wallace further testified that she interviewed Ms. Taylor after she was detained by OPNET. Wallace stated that during the interview Ms. Taylor admitted that she knew that Rankich is a convicted felon and is not allowed to purchase or possess a firearm. TR 36. She also admitted that Rankich accompanied her when she purchased her guns. TR 33, 40. Wallace testified that Ms. Taylor consistently stated that the guns belong to her. TR 33-35. According to Wallace, Ms. Taylor told her that she purchased the guns because (1) they "were good deals," (2) "felt good in her hand," (3) for protection, and (4) as an investment. TR 33-35, 52, 59. Wallace further testified that Ms. Taylor told her that Rankich would research the guns online and tell her which guns were a "good deal." TR 33, 48. Based on this advice, Ms. Taylor would purchase the guns. Wallace claims that Ms. Taylor admitted that Rankich accompanied her when she went target shooting and that Ms. Taylor told her Rankich likes to shoot. TR 41, 53, 70. Wallace

---

[3]       As discussed below, Ms. Taylor testified that one of the reasons Rankich accompanied her to the gun shops is that she is hard of hearing and, as such, needed Rankich there to assist her with the transactions.

further "believe[d] [that Ms. Taylor] said that [Rankich] did hold [the gun] for her because of her hand being the way that I had seen it that day." TR 56. However, Wallace also testified that Ms. Taylor told her that Rankich did not shoot the guns; rather, Ms. Taylor "was the one who fired the weapon." TR 62.

During this interview, Wallace noticed that Ms. Taylor's left hand was swollen and that she appeared to be trying to keep the hand elevated. TR 43, 61. Wallace stated that she expressed skepticism to Ms. Taylor that she could fire the guns because of the condition of her hand, but, according to Wallace, Ms. Taylor reassured her that she could fire the weapons. TR 61.

The final witness for the Government was Joseph Gilbert, an employee at Doc Neeley's Gun Shop. TR 115. Gilbert testified that Rankich brought the Ruger SR40 into the gun shop for cleaning on February 25, 2013. TR 116. He identified a two-part tag as the receipt that he gave Rankich for the cleaning. *Id*.; P. Ex. 24l. On the back of the tag Gilbert wrote down the gun type, serial number, and the telephone number for the gun shop. *Id*. He also listed Rankich as the gun owner on the receipt. *Id*.

Ms. Taylor testified on her own behalf. She testified that she did not purchase the guns for her son; rather, she purchased the guns for her protection and as an investment. TR 124, 130. She claimed that she would become frightened when she was home alone because "[e]verybody knows that we have a lot of stuff," so she bought the guns so she could "feel safe." TR 130. She also testified that she was aware of the news coverage of recent shootings and the move to limit gun ownership in light of these shootings. TR 124. She was concerned that it would become difficult to purchase guns and/or ammunition. *Id*. Therefore, she decided to purchase the guns and ammunition as an investment. *Id*. She testified that Rankich is gravely ill and that she planned to sell the guns after he dies in order to pay for his cremation. TR 131. "Why would I

buy guns for a dying man? I bought them for me so I could sell them and pay for [his] cremation." *Id*.

She testified that in order for her to buy a gun, it "had to be two things. It had to fit in [her] hand, and it had to be the right price." TR 126. She further testified that Rankich would research firearms and their prices and would let her know which guns were a "good deal." She acknowledged that several of the guns she purchased had a lot of power and could be seen as an odd choice for someone her age, but she claimed that she never "intend[ed] to fire them," she "was merely collecting [them]." *Id*.; *see also* TR 124 (stating that she never intended to fire the Zastava AK-47, the Nano, or the Hi-Point pistol, but instead "those guns simply became collection items.").

She conceded that Rankich was with her each time she purchased a gun, but she claimed it is because she is hard of hearing and needed him there to help her understand the conversation. TR 85. She disputed that Rankich carried the Rugar SR40C out of Doc Neeley's Gun Shop as the Government witnesses had testified and the surveillance video appeared to show (surveillance video shot outside Doc Neeley's Gun Shop was entered into evidence by the Government, P. Ex. 27). She claimed that the video did not show that just before they exited the gun shop, Rankich took the Rugar out of the box, handed it to her, and she put it in her sweater pocket. TR 131. Then, before she dropped him off, he handed the box back to her, and she put the gun back into it. TR 131-132.

She also admitted that Rankich went target shooting with her, but only to "instruct" her on how to shoot. TR 126. She further testified that while she told Wallace that Rankich enjoyed shooting guns, she meant that he shot air pistols and paint guns. TR 69. She further claimed that

Rankich has been selling the air pistols and paint guns "one by one because he can't use them anymore" since he became too ill. TR 127.

In addition, she testified that the Crimson spotting scope Rankich purchased was a birthday gift to her so she "could see where she was shooting." TR 122. Lastly, she testified that Rankich is very possessive of his stuff. TR 129. "Everything he owns" is kept on his side of the house. *Id*. "If [the guns] were his, he'd have had them in his room, trust me." TR 129-130.

### B.    Exhibits

The Government's exhibits, 1-24(a-m) and 25-29, and Ms. Taylor's exhibits 50-78 were admitted at trial. Key exhibits include the following:

Government ("P.") Exhibit 1: Copies of Rankich's Felony Judgment and Sentence reports;

P. Exhibit 10: An executed ATF Form 4473 for each firearm purchase;

P. Exhibits 12-14: Invoices from Doc Neeley's for the purchase of the Ruger SR40C, Beretta Nano 9mm, and Hi Point 9mm pistol;

P. Exhibit 17: Signed Affidavit of Ms. Taylor dated April 13, 2013 regarding the transfer of the Zastava AK 47 through Blue Mountain Gunworks;

P. Exhibit 19: Map to "Slab Camp";

P. Exhibit 21: Receipt from PLG to Rankich for Crimson Trace LG483 Laserguard for Beretta Nano 9mm Laser Sight dated April 6, 2013;

P. Exhibit 24a: Photographs Bates Stamped 000174, 000178 showing Rankich carrying a white box outside Doc Neeley's Gun shop;

P. Exhibit 24c: Photograph Bates Stamped 000247 showing Ms. Taylor's dining room table with firearms on and/or around it;

P. Exhibit 24l: Photographs Bates Stamped 000242-244 of cleaning receipt dated February 25, 2013 for the Ruger SR40C listing Rankich as the "owner";

P. Exhibit 27: Video surveillance of exterior of Doc Neeley's taken on April 15, 2013;

Defendant's ("D.") Exhibits 61: Ms. Taylor's 2011 federal tax refund;

D. Exhibit 62: USbank Statement dated July 12, 2012;

D. Exhibit 63: A claim check from Combined Insurance Company of America dated January 14, 2013;

D. Exhibit 64: Ms. Taylor's 2012 federal tax refund;

D. Exhibit 65: A claim check from Combined Insurance Company of America dated April 12, 2013; and

Defendant's Exhibit 67: a diagram of Ms. Taylor's home.

## IV.    LEGAL STANDARDS

Under the Civil Asset Forfeiture Reform Act of 2000, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the [firearms are] subject to forfeiture[.]" 18 U.S.C. § 983(c)(1); *see United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002) ("CAFRA transferred the burden of proof from the claimant to the government and required the government to establish forfeiture by a preponderance of the evidence rather than by the lower probable cause standard [.]"). If the Government meets its burden of proof regarding forfeiture, the burden shifts to Ms. Taylor to prove, by a preponderance of the evidence that she is an "innocent" owner of the firearms. 18 U.S.C. § 983(d); *see United States v. Currency, U.S. $42,500.00,* 283 F.3d 977, 980 (9th Cir. 2002). An "innocent owner" is one who "did not know of the conduct giving rise to forfeiture," or "upon learning of the conduct giving rise to forfeiture, did all that reasonably could be expected under

the circumstances to terminate such use of the property. *Id*. at § 983(d)(2)(A)(i)-(ii). *See United States v. 493,850 in U.S. Currency*, 518 F.3d 1159, 1170 (9th Cir. 2008).

Here, the Government asserts that the firearms are subject to civil forfeiture under 18 U.S.C. § 924(d)(1), which provides:

> Any firearm or ammunition involved in or used in any knowing violation of... [ 922(a)(6) or 924(a)(1)(A)] … shall be subject to seizure and forfeiture  …[.]

Sections  922(a)(6) and 924(a)(1)(A), in turn, describe separate statutory offenses. *United States v. Buck*, 548 F.2d 871, 876-77 (9th Cir. 1977).  Section 922(a)(6) makes it unlawful:

> for any person in connection with the acquisition … of any firearm … from a … licensed dealer … knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such … dealer … with respect to any fact material to the lawfulness of the sale or other disposition of such firearm.

Section 924(a)(1)(A) establishes a criminal penalty for anyone who "knowingly makes any false statements or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter."

Therefore, in order to establish that the firearms are subject to civil forfeiture under Section 924(d)(1), the Government must prove by a preponderance of the evidence that Ms. Taylor: (1) knowingly made, (2) a false or fictitious written statement in connection with the purchase of firearms, (3) intended to deceive or likely to deceive a licensed firearms dealer, (4) and the false statement was a fact material to the lawfulness of the sale or disposition of the firearm. *United States v. Ortiz*, 318 F.3d 1030, 1036 (11th Cir. 2003). Alternatively, the Government must establish by a preponderance of the evidence that: (1) the gun shop owners were federally licensed firearms dealers at the time the events occurred; (2) Ms. Taylor made a false statement or representation in a record that the licensed firearms dealers were required by federal law to maintain; and (3) Ms. Taylor made the false statement with knowledge of its

falsity." *United States v. Abramski*, 706 F.3d 307, 316–17 (4th Cir.2013), *aff'd* ___ U.S. ____,

134 S.Ct. 2259 (2014).

## VI.    DISCUSSION

The Federal Government regulates firearm sales by licensed firearms dealers through the

Gun Control Act of 1968, 18 U.S.C. § 921 *et seq*. The Act provides a detailed scheme to enable a

federally licensed firearms dealer to verify, at the point of sale, whether a potential buyer may

lawfully own a gun. To that end, the Bureau of Alcohol, Tobacco, Firearms and Explosives

(hereinafter "ATF") developed Form 4473 for gun sales. Form 4473 requires the purchaser to

provide certain identifying information. The Form also lists all the factors disqualifying a person

from gun ownership, and asks the would-be buyer whether any of them apply. Significant to this

case, Question 11.a. on the Form asks:

> Are you the actual transferee/buyer of the firearm(s) listed on this form?
> **Warning: You are not the actual buyer if you are acquiring the firearm(s) on
> behalf of another person. If you are not the actual buyer, the dealer cannot
> transfer the firearm(s) to you**.

The accompanying instructions for that question provide:

> **Question 11.a. Actual Transferee/Buyer**: For purposes of this form, you are the
> actual transferee/buyer if you are purchasing the firearm for yourself or otherwise
> acquiring the firearm for yourself.... You are also the actual transferee/buyer if
> you are legitimately purchasing the firearm as a gift for a third party. **ACTUAL
> TRANSFEREE/BUYER EXAMPLES**: Mr. Smith asks Mr. Jones to purchase a
> firearm for Mr. Smith. Mr. Smith gives Mr. Jones the money for the firearm. Mr.
> Jones is **NOT THE ACTUAL TRANSFEREE/BUYER** of the firearm and must
> answer "NO" to question 11.a.

ATF Form 4473 (emphasis in original); P. Ex. 10. After completing the Form, the purchaser

must sign a certification declaring her answers "true, correct and complete." *Id*. That certification

provides that the signator "understand[s] that making any false ... statement" respecting the

transaction—and, particularly, "answering 'yes' to question 11.a. if [she is] not the actual

buyer"—is a crime "punishable as a felony under Federal law." *Id.*

Here, Ms. Taylor answered "yes" to question 11.a each time she purchased one of the

firearms subject to this civil forfeiture. The Government charges that each time she answered

"yes" to question 11.a, she violated Sections 922(a)(6) and/or 924(a)(1)(A) because she was not

the "actual buyer" of the firearms. Rather, the Government argues, Ms. Taylor was really buying

the guns for Rankich who could not legally own the guns. Ms. Taylor counters that she answered

question 11.a truthfully because she purchased the guns for herself.

The Court finds that the Government has proven by a preponderance of the evidence that

Ms. Taylor knowingly made a false statement (*i.e.* answering "yes" to question 11.a on Form

4473) that was intended to deceive a licensed firearm dealer and the false statement was material

to the sale of the firearms. Specifically, the Court finds that while Ms. Taylor committed the

physical act of purchasing the firearms (indeed, with her own money), the purchases were made

on behalf of her son. Rankich researched the guns, arranged for at least one gun to be transferred

to a gun shop, went to the gun shops with Ms. Taylor, pointed out the guns, asked the gun shop

employees about the guns, decided that those were the guns he wanted, and then instructed Ms.

Taylor to purchase them. He then picked up at least one of the guns and carried it out of the gun

shop.[4] Rankich purchased ammunition, a laser sighting scope, and other paraphernalia for the

guns. He also went shooting with Ms. Taylor. Lastly, Rankich took at least one of the guns in for

cleaning and indicated that he was the owner of the gun.[5]

---

[4]        The Court does not find credible Ms. Taylor's testimony that she had removed the gun
from the box and put it in her pocket and that, therefore, Rankich was carrying an empty box.
[5]        The Court notes that some of the testimonial evidence may contain hearsay. However,
Ms. Taylor failed to object to the testimony. Thus, the Government had no opportunity to explain
why the testimony did not constitute hearsay, or if it did, whether an exception applied to the

Ms. Taylor does not dispute that the gun shop owners are federally licensed dealers. Nor does she dispute that she was aware that Rankich could not legally purchase the guns himself, thereby making her false statement to question 11.a on the 4473 Forms material to the sale of the firearms. Accordingly, the Government has met its burden of proof to establish violations of Sections 922(a)(6) and 924(a)(1)(A).

Further, this Court concludes that Ms. Taylor is not an "innocent owner" of the firearms. In order to establish this defense, Ms. Taylor would have to prove by a preponderance of the evidence that she "did not know of the conduct giving rise to forfeiture," or "upon learning of the conduct giving rise to forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." § 983(d)(2)(A)(i)-(ii). Ms. Taylor has not met her burden. The Court acknowledges that she claims to have purchased the firearms for her protection and as an investment. However, the Court does not find this testimony credible. Her testimony was inconsistent in this regard. For instance, she stated that she purchased the guns because they "felt good in her hand," yet she testified that she never intended to fire the guns. Moreover, several of the guns required two hands to shoot (because of their weight and size, as well as the recoil) several witnesses noted, and indeed Ms. Taylor conceded, that her left hand was significantly injured at the time of the purchases. Other times Ms. Taylor testified that she purchased the guns as an investment, but then indicated that she would sell the guns to pay for Rankich's cremation. Finally, she stated that she purchased the guns for her protection, but

---

testimony. "[W]here there is no objection to hearsay evidence, the [court] may consider it for whatever value it may have; such evidence is to be given its natural probative effect as if it were in law admissible." Moreover, in a bench trial, "it is to be presumed, absent a showing to the contrary, that the District Judge considered only material and competent evidence in arriving at [her] findings …" *Dedmore v. United States*, 322 F.2d 938, 946 (9th Cir. 1963); *see also*, *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994) ("[In] a bench trial, the risk that a verdict will be affected unfairly and substantially by the admission of irrelevant evidence is far less than in a jury trial.").

the Court finds persuasive the testimony of Rogers and Wallace that they believed the type of guns she purchased where not suitable for her use given her hand injury and age. In the end, the Court simply does not find credible Ms. Taylor's testimony that she purchased the guns for herself.

What the Court does find is that Ms. Taylor deeply loves her gravely ill son and she wanted to do something that would bring him happiness in the presumably limited time he has remaining. Therefore, she bought these guns on his behalf because he could not purchase them himself. While Ms. Taylor's actions were motivated by love, they violate Section 922(a)(6) and 924(a)(1)(A). Accordingly, the guns are subject to civil forfeiture under Section 983(c)(1).

## VII.   CONCLUSION

Based on the foregoing, the Court HEREBY FINDS in favor of the Government, DECLARES that the firearms are property involved in violations of 18 U.S.C. §§ 922(a)(6) and 924(a)(1)(A), and thus are subject to forfeiture in accordance with 18 U.S.C. § 924(d)(1).

Dated this 5th day of August, 2015.

Barbara Jacobs Rothstein
U.S. District Court Judge